**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0491n.06

No. 19-4265

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 20, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | THE UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| | ) | |
| CODY DAVID SWINNERTON, | ) | **OPINION** |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

**BEFORE: NORRIS, NALBANDIAN, and READLER, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** Defendant Cody Swinnerton appeals the sentence of 420 months of incarceration that he received in the wake of a guilty plea to nine counts involving sexual offenses against minors. On appeal he argues that his sentence was both procedurally and substantively unreasonable because the court failed to give balanced consideration to all of the sentencing factors included in 18 U.S.C. § 3553(a), among them his strong family ties, his relatively young age at the time he committed the offenses, and his own history of juvenile sexual abuse. Defendant also contends that the district court relied upon erroneous and unproven facts when passing sentence.

While thirty-five years is a lengthy sentence, it falls within the advisory guidelines range. In fact, the court granted his motion for a downward variance, albeit not to the extent requested. Accordingly, we affirm the judgment.

**I.**

On July 16, 2019, the government filed a superseding indictment charging defendant with nine counts of sexual offenses directed against children: seven counts of sexual exploitation of children, 18 U.S.C. §§ 2251(a), 2251(c)(1)(A); one count of receiving visual depictions of minors engaged in sexually explicit conduct, 18 U.S.C. § 2252(a)(2); and one count of possession of child pornography, 18 U.S.C. § 2252A(a)(5)(B). Defendant elected to plead guilty to all counts without the benefit of a plea agreement. (Page ID 598-602.)

The criminal conduct that gave rise to this prosecution is not in dispute. At defendant's change of plea hearing the government provided the court with a broad outline of what it intended to prove if the matter went to trial. (Page ID 580-90.) The presentence report dated December 17, 2019, to which defendant lodged no objections, contains a more detailed description of the conduct underlying each of the charged counts. (PSR ¶¶ 5-16.)

The prosecution had its genesis in 2018 when the Ohio Internet Crimes Against Children Task Force received eight tips from the National Center for Missing and Exploited Children that led investigators to defendant, a twenty-four year-old man living in Berea, Ohio. Initial review of the material contained in the tips revealed approximately 120 files that minors had shared with defendant via Instagram. These files, which were created by the minors (all of whom were pubescent boys) at defendant's behest, depicted them exposing their genitals and masturbating. (PSR ¶ 6.)

On January 25, 2019, authorities executed a search warrant for defendant's residence: his parents' house. Defendant's computers were removed from the home and a subsequent review of their contents revealed 345 images and 295 videos depicting child pornography. These files dated

as far back as 2012, when defendant was eighteen. (PSR ¶ 8.) Further investigation revealed that defendant had engaged in oral sex with two of his victims, both of whom were thirteen at the time.

When the search of his parents' home occurred, defendant was in Australia pursuing another adolescent boy whose family had welcomed him into their home. The victim's parents later told investigators that defendant began acting noticeably different during the last two weeks of his stay in Australia, which coincided with the search of his parents' house. In fact, defendant failed to take a scheduled flight back to the United States. When he returned two weeks later, he was arrested.

While the details of defendant's criminal behavior can be found in the above-referenced pages of the change of plea hearing and presentence report, it took two basic forms. Those victims whom he got to know—and with whom he had sexual relations—were groomed with care. Defendant would ingratiate himself to the boys and their families through a mutual interest in sports. (Defendant made much of his connection with the Cleveland Cavaliers.) He was so adept that he was invited to stay in his victim's home by the parents. While there he would surreptitiously take pictures of the boys naked or masturbating. He also filmed himself performing oral sex with at least one of the boys while they were sleeping.

His other victims were ensnared online. Posing as a teenage girl, defendant would urge his victims to send pictures of themselves naked. Then, he (posing as she) would demand more—such as a video of the boy masturbating—by threatening to send the pictures he already had to a wider audience. A sample of the sheer panic these threats could produce is found in the presentence report, which includes an Instagram chat between defendant and a victim. (PSR ¶ 15.)

Defendant had no prior criminal history. However, the presentence report, which defendant accepted, noted that his total offense level of 43 carries a guideline range of life, capped by a

statutory maximum sentence of 3,000 months. The district court declined to grant defendant's

motion for a downward departure although it did grant a variance and sentenced him to 420 months

of incarceration.

**II.**

We apply the following approach when reviewing sentences imposed under the advisory

guidelines:

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

*Gall v. United States*, 552 U.S. 38, 51 (2007) (citation omitted); *see also United States v.*

*Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

Procedural Reasonableness

Defendant's primary contention with respect to procedural reasonableness is that the

district court's conclusion about the danger of future recidivism is based upon an "erroneous fact."

During the sentencing hearing, defendant apologized for his actions: "What I did is, was and

always will be inexcusable and flat-out wrong of me." (Page ID 492.) This statement led the district

court to pose the following question:

> So why didn't you stop? At any time. Pick a time. Pick between victims 2 and 3 or 3 and 6, or perhaps even before victim 7.
>
> You knew your home had been searched, yet you still used that camera [in Australia], and I'm told it was in the bag in the bathroom where that boy would shower and do things that you knew about. And this is after you knew, had real good reason to believe that the United States was on to you, because a search warrant had been executed at your home.
>
> So tell me, if you knew it was wrong, why didn't you stop, especially after you knew you were caught?

(Page ID 492-93.)

Shortly after this exchange, the district court imposed its sentence. In part, the court

acknowledged that the propensity for the defendant to re-offend even after knowing that defendant

had been unmasked contributed to its thinking:

> And I've heard many things. From you, less than I would have hoped. Certainly words that speak to what you've done, but none that help me understand why you did it. And, quite frankly, I'm not at all persuaded that you won't do it again, because you already did. You repeated this act over and over and over again. And you even did it after you knew your home had been searched.

(Page ID 503.)

After passing sentence, the district court asked counsel to raise objections. The government

voiced none. Defense counsel stated first that he had "an obligation to preserve these objections,"

before arguing that the court had failed to fully consider the § 3553(a) factors, which resulted in a

sentence "greater than necessary to comply with the purposes and principles of sentencing." (Page

ID 524.) Defendant had urged the court to impose a fifteen-year sentence.

The court offered this supplemental reasoning in response:

> [A] 15-year sentence doesn't begin to be respectfully responsive to the laws that Mr. Swinnerton broke, to the harm perpetuated [sic] on victims, even though he

5

tells me that he suffered from similar crimes himself, even though I know from the text messaging captured between him and his victims that . . . [h]e knew precisely what worried them and how to prey on them.

. . . .

Also, it's necessary to protect society. I'm not sure. My hope is that by the conclusion of this sentence, Mr. Swinnerton's cunningness, his sophistication, his willingness to groom and deceive will be something of the past. Today there is no way I think that would be a likelihood if I were to have limited his sentence to only one term of 15 years.

. . . .

I believe he went to Australia for that same purpose. And then he stayed there, knowing at some point he had to leave, to go somewhere. And after all, the United States knew where he was. There was already a request for assistance sent to Australia.

So that he continued past exposure, past having been caught, tells me that a 15-year term is a good start, but certainly not responsive to his request.

(Page ID 524-26.)

Defendant argues that the district court wrongly relied upon its assumption that defendant knew that his home had been searched and nevertheless committed another sex crime. In support of this position he notes that the search of his home occurred on January 25, 2019. Yet Count 9 of the superseding indictment alleges the criminal behavior in Australia occurred sometime between January 24 and January 31, 2019. (Page ID 195.) Defense counsel points out that the government presented evidence only that defendant was stopped at the Sydney airport on February 17, 2019. Specifically, the government made the following argument at sentencing concerning whether defendant knew of the search of his home:

But what we do know is on the day he had a plane ticket to come home, he never showed up at the airport. And then he asked the family that he's staying with, "Can I stay longer? I'd like to extend my stay."

And after that happens, after the search warrant occurs here . . . he records . . . the victim named in Count Number 9 by sliding his camera or placing his camera

6

under the bathroom door to record [the victim] engaged in masturbatory activity before he showers . . . .

But he knew that. The defendant knew that, and he recorded him engaged in that behavior on a camera even after law enforcement authorities back here searched his home and seized his devices.

. . . .

The other thing that I note in the [sentencing] memorandum is an interview with the parents of the victim that he was staying with in Australia. And they said that after he asked to remain in Australia for an extra period of time, they noticed that the week before he left, he became very nauseous, very anxious, and that he had thrown up.

When you put all of those things together . . . it sure seems that Cody Swinnerton was fully aware of the fact that now he had nowhere else to go, he was headed back to Cleveland, Ohio, where he was going to faces charges related to the images on his devices.

(Page ID 482-84.)

The government directs us to *United States v. Cunningham*, 669 F.3d 723, 730 (6th Cir. 2012) (citing *United States v. Wilson*, 614 F.3d 219, 225 n.3 (6th Cir. 2010) (a sentencing judge relies upon clearly erroneous facts when she gives importance to inaccurate information)). Here, the record supported the court's use of the contested information. In addition to the considerations cited by the district court, the government adds that defendant's phone and other devices held over 8,000 images that had been deleted just two days before he was detained at the Sydney airport. (Page ID 483.) He also had changed his name on Instagram and left himself a note that read, "Take pics off phone and off the microSD card." (Page ID 484.) Given these factors, which defendant does not dispute, the government argues that the district court properly relied upon the assumption that defendant knew about the search of his home but continued his criminal behavior despite that knowledge.

Defendant also takes issue with the government's contention during the sentencing hearing that the district court did not have the entire spectrum of defendant's victims before it:

> [W]hat we have here today in front of this court is very likely not the universe of victims of Cody Swinnerton. I would remind the court that the material that we had was limited by what was on his most recent phone that was synced to his laptop, and what was in the cyber tips that was [sic] submitted by Instagram in . . . 2018 to Ohio ICAC. We don't have the universe of his devices. We can't get into some of his devices due to Apple encryption, or what phones he may have had before he had the current iPhone that he took with him.
>
> What we do know is there were 345 unique images and 295 unique videos on the laptop, but there were almost 1,500 images and almost 500 videos of what we call sexually exploitive material. Which means either we are unable to say with complete accuracy whether or not the person is a minor, so when we're not sure, we err on the side of caution.

(Page ID 484-85.) Defendant argues that the government concedes that the existence of more victims is speculative and did not meet the requirements to initiate a prosecution. The district court therefore should not have considered it during sentencing. However, while the government made this argument, the district court gave no indication that it factored into its sentencing calculation in any significant way.

Finally, defendant argues that the district court wrongly considered the government's argument questioning his own history of sexual abuse, which occurred when defendant was in the sixth grade, despite its being included in a competency report cited in its sentencing memorandum, (Page ID 286), but called into question by counsel at the actual hearing. (Page ID 486) ("For myself as a prosecutor who has dedicated my career to prosecuting people who harm children, every defendant now, every defendant says that they were sexually abused as a child.").

The government responds to this point by noting that the district court did not, in fact, rely on this argument. The court merely observed, "I wish you could have helped me to understand how you could have perpetuated over and over again the crimes that were so full of hurt and a lack

8

of concern, especially when on one hand you tell me you know what your victims feel." (Page ID 502.)

In our view, the sentence meets the requirements of procedural reasonableness. First, the parties agree that the guidelines were properly calculated. Second, the court did not rely upon any clearly erroneous facts. Third, the district court adequately explained the sentence and, when asked to do so, provided additional clarification. In short, the district court did not abuse its discretion in sentencing.

<u>Substantive Reasonableness</u>

As mentioned earlier, a substantive unreasonableness occurs when a sentence is arbitrarily selected or when the court either fails to consider factors listed in § 3553(a) or gives undue weight to certain factors. *Cunningham*, 669 F.3d at 733.

Defendant argues that the district court failed to give enough weight to several considerations: his relative youth when committing the offenses (between eighteen and twenty-five); his own history of sexual abuse in sixth grade; and his unwavering family support. Finally, he contends that the sheer length of his sentence is greater than necessary to comply with the factors listed in § 3553(a)(2): the seriousness of the offense; the protection of the public; deterrence; and effective rehabilitation.

The government points out that defendant benefitted from a downward variance. Moreover, the sentencing transcript reflects that the district court considered his mental health, family circumstances, and age. While the court may not have assigned them the weight that defendant would have preferred, it undeniably considered them and offered reasons for imposing the sentence that it did.

Again, we detect no abuse of discretion with respect to the weight assigned to the various sentencing factors. In the end, defendant benefitted from a downward variance which effectively undermines his argument.

**III.**

The judgment is **affirmed**.